# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

SHARON KRAMER,

    Plaintiff,

v.

MERCY HOUSING, INC., a Nebraska nonprofit corporation,

    Defendant.

_____

## COMPLAINT
_____

Plaintiff Sharon Kramer, by and through counsel, states the following Complaint against Defendant.

## JURISDICTION AND PARTIES

1. Plaintiff Sharon Kramer is a citizen of the United States, and a resident of Aurora, County of Arapahoe, State of Colorado. She is a former employee of Mercy Housing, Inc.

2. Defendant Mercy Housing, Inc. is a § 501(c)(3) Nebraska corporation registered to do business and doing business in Colorado. Its principal place of business is in Denver, Colorado. Defendant develops, finances and operates housing facilities for people with special needs.

3. Defendant Mercy Housing, Inc. and Mercy Loan Fund, an operating division Defendant created to provide financing to local nonprofit organizations, are recipients of substantial federal funding.

4. This is an employment discrimination action. Plaintiff alleges violations of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* and the Rehabilitation Act

of 1973, 29 U.S.C §§ 701, *et seq.* The Court's jurisdiction over this action is invoked pursuant to 42 U.S.C. § 12117(a) and 29 U.S.C. § 794a.

5. The conduct complained of herein occurred within the State of Colorado.

6. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(c).

## ADMINISTRATIVE PROCEDURE

7. On or about April 1, 2010, Plaintiff filed Charge of Discrimination no. 541-2010-01265 with the Denver Field Office of the U.S. Equal Employment Opportunity Commission.

8. Plaintiff's Charge of Discrimination included allegations of disability discrimination and retaliation.

9. On October 26, 2010 the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue.

10. This action is timely filed.

## FACTUAL ALLEGATIONS

11. Plaintiff incorporates by reference the allegations set forth above in paragraphs one through ten.

12. Plaintiff was hired by the then-President of Mercy Loan Fund (MLF), Diane Leavesley, in April 2007.

13. Plaintiff worked in Defendant's MLF division for her entire term of employment with Defendant.

14. Her position was that of "Portfolio Manager."

15. Plaintiff's duties included preparation, review and oversight of loan documents, processing of paid loans, design of forms, training of staff, data input and handling of incoming funds.

16. Plaintiff's performance was rated as higher than satisfactory for her entire term of employment with Defendant.

17. Plaintiff suffers from chronic asthma and allergies.

18. Plaintiff's medical condition restricts her ability to breathe, sometimes severely, when exposed to strong scents or fragrances.

19. Ms. Leavesley left her position as MLF President in early 2009.

20. Before leaving, she completed a performance evaluation for MLF Administrative Assistant, Sheryl McCall.

21. The evaluation assessed Ms. McCall as a poor performer. It found that she was not a "team player." It included an instruction that she ask the others in the office if they needed her help on a daily basis.

22. Ms. McCall came to believe that Plaintiff had had input into the review and that her input was the basis of the poor rating.

23. Plaintiff and Ms. McCall's working relationship became strained because of Ms. McCall's beliefs about Plaintiff's participation in the performance evaluation.

24. Plaintiff and Ms. McCall met in May 2009 to discuss the deteriorating nature of their relationship.

25. During the course of their discussion, Ms. McCall blamed Plaintiff for her poor performance rating.

26. Ms. McCall complained to Plaintiff that, whereas her assistance to Plaintiff in doing filing had been purely voluntary before, now it had been made a part of her job description.

27. Ms. McCall's demeanor and language during this meeting were expressive of significant anger towards Plaintiff. She threatened Plaintiff, telling her that she now saw their relationship as a "pissing contest" and she was going to make Plaintiff feel as bad as she had as a result of the review.

28. Plaintiff stopped asking Ms. McCall for administrative assistance immediately.

29. On September 22, Ms. McCall and her friend, Laurie Glasgow-Gill, a Loan Fund Administrator, refused to move out of the way when Plaintiff said "excuse me" while exiting the elevator on their floor, forcing Plaintiff to have to squeeze by them.

30. On September 23, as Plaintiff walked by Ms. McCall's desk, she heard Ms. McCall and Ms. Glasgow-Gill joking in such a way that Plaintiff could hear.

31. Ms. McCall and Ms. Glasgow-Gill made comments such as, "Oh, what smells?" Ms. Glasgow-Gill said that it must be Plaintiff as she had just walked past. Ms. McCall responded that she would "take care of it." She then sprayed a cinnamon-scented product towards the wall of Plaintiff's cubicle, so that it went over the wall directly to Plaintiff.

32. Plaintiff asked Ms. McCall to spray in a different direction because strong scents can cause her asthma to flare up.

33. The spray was strong enough that it caused Plaintiff to have the taste of it in her mouth.

34. Plaintiff asked her supervisor, Director of Lending and Asset Management Jennifer Balkcom, for assistance in dealing with her co-workers' derisive conduct, which was creating a hostile, and even dangerous, environment for her.

35. Ms. Balkcom advised Plaintiff that she would speak to Warren Horvath, who had succeeded Ms. Leavesley as President of MLF earlier in the year, and that Plaintiff should keep notes to describe any future harassing events, showing when they occurred.

36. On September 24, Ms. McCall again sprayed a fragrance product around Plaintiff's cubicle.

37. To make sure she wasn't overreacting, Plaintiff asked a co-worker, Executive Assistant Monet Karns, to come to her cubicle to get her opinion on how strong the scent was.

38. Ms. Karns found the scent overpowering, felt like she had to cough, and later complained of a headache which she contributed to the scent.

39. Ms. Karns reported the noxious nature of the spray to Vice-President of Human Resources Chris Shott.

40. Mr. Shott told Plaintiff to get a note from her physician, describing her sensitivity to the spraying.

41. Plaintiff complied. She delivered a September 29 note from her doctor to Human Resources stating that she suffers from chronic asthma and requires a fragrance-free work environment.

42. In early October, Mr. Shott took statements from several employees about the use of fragrances in MLF.

43. Also in early October, Mr. Shott told the employees around Plaintiff's cubicle that the area would be made a fragrance-free work zone.

44. On October 7, Ms. McCall agreed that she would not bring scented products to work.

45. Ms. McCall sprayed fragrances at work three or four times in October.

46. Plaintiff complained to Human Resources about the continued spraying.

47. Plaintiff was away for about two weeks in November, as was Ms. McCall.

48. Ms. McCall sprayed perfume next to Plaintiff's cubicle in November, causing the necessity of Plaintiff's use of her inhaler more frequently than before.

49. Plaintiff reported this continued problem to Mr. Horvath.

50. On December 2, strong-scented products were used in near proximity to Plaintiff three times within about a half-hour time period.

51. Plaintiff experienced difficulty breathing and had to leave work.

52. Plaintiff saw her physician on December 3, as her asthma had become uncontrolled.

53. Plaintiff provided Human Resources with another note from her physician on December 4, stating that she suffers from chronic moderate asthma and "must be provided an aerosol free environment."

54. Plaintiff's physician instructed her to start taking her nebulizer to work after this episode.

55. Also on December 4, in an attempt to obtain a fragrance-free environment, Plaintiff filed an internal "Employee Grievance Form" complaining of "continued spray of fragrance."

56. Also, on or about December 4, Human Resources submitted a workers' compensation claim report with Liberty Mutual Insurance Group relating to the exacerbation of Plaintiff's symptoms from the spraying in her work area, noting the date of injury as December 2. Defendant contested the claim, and it was later denied as involving a pre-existing condition.

57. On December 9, Mr. Horvath sent an email to MLF employees noting the "excessive use of fragrances" and asking that the use of "such items" be discontinued immediately, unless cleared with Human Resources beforehand.

58. Plaintiff was subjected to more strong fragrance on December 10. She complained to Mr. Shott.

59. On December 14, Plaintiff had trouble breathing because of a strong fragrance in her cubicle.

60. On December 15, Plaintiff suffered another asthma attack at work. She had serious trouble breathing. She went to the Emergency Room at Presbyterian/St. Luke's Hospital.

61. On that same day, Mr. Shott found a bottle of Victoria's Secret Body Lotion on Ms. McCall's desk.

62. Plaintiff called in sick on December 16.

63. Plaintiff saw her physician on December 17. Her physician told her to tell Human Resources that she was "on FMLA."

64. On December 18, Plaintiff informed Human Resources that her physician had directed her to go on medical leave.

65. Also on December 18, Mr. Shott told Plaintiff he would provide her with FMLA forms.

66. On December 21, Plaintiff reminded Mr. Shott that he was going to provide her with the forms. The forms were provided later that day.

67. On December 22, Mr. Horvath imposed a warning on Ms. McCall for her continued use of fragrances at work.

68. On December 23, Plaintiff's physician signed, and had faxed, the FMLA

"Certification of Health Care Provider" form, to Human Resources.

69.    The form recited that Plaintiff would require evaluations for pulmonary function and allergy.

70.    On January 14, Plaintiff wrote to Mr. Horvath, stating that she would be able to return to work January 18; she received a message that January 18 would be a holiday.

71.    Ms. Balkcom requested a note from Plaintiff's physician for Plaintiff's return.

72.    Plaintiff's physician asked for an assurance that Plaintiff's environment would be fragrance-free upon her return.

73.    Plaintiff informed Ms. Balkcom of her physician's request.

74.    Human Resources assured Plaintiff that her work environment would be fragrance-free.

75.    Mr. Horvath decided that Plaintiff's work environment would not be made "fragrance-free" until after Plaintiff returned to work.

76.    Plaintiff returned to work on January 19, 2010.

77.    After a couple of hours, Plaintiff noticed a fragrance present in her work area. She reported it to Mr. Shott.

78.    Mr. Shott sent Plaintiff home pending an investigation of the source of the fragrance.

79.    Mr. Shott told Plaintiff he wanted to move her. Plaintiff told him that she did not want to be segregated and treated differently.

80.    Even if moved, Plaintiff would have to go to her old work area, next to Ms. McCall's cubicle, for files.

81.    On January 20, Plaintiff arrived at work to find that her computer and personal

items were missing. She was alarmed.

82. She tried to find someone to tell her what had happened, but no one was around.

83. Plaintiff left work, calling Human Resources on the way to her car. She left a voice message asking if she had been terminated.

84. Plaintiff called her Case Manager at Liberty Mutual to see if she could help.

85. Mr. Shott called Plaintiff and ordered her to return to work. She refused.

86. Plaintiff emailed Mr. Horvath to inform him she felt sick and would not be reporting to work on January 21.

87. The next day, January 22, was a day off for Plaintiff.

88. Monday, January 25, was a day off for Plaintiff.

89. Plaintiff did not call in on January 26 as she felt she was still fighting for the scent-free environment that her physician required as a condition of her return. She called her Case Manager to find out what she should do.

90. On January 27, she received her personal belongings from Defendant via FedEx, with no note or other communication included.

91. On January 28, she received a termination notice and final paycheck from Defendant.

## FIRST CLAIM FOR RELIEF
### (ADA – Failure to Reasonably Accommodate)

92. Plaintiff incorporates by reference the allegations set forth above in paragraphs one through 91.

93. Plaintiff is substantially limited in the major life activity of breathing.

94. At all times pertinent hereto, Plaintiff has been qualified to perform the essential functions of the position she held at the time of her termination, with or without reasonable accommodation.

95. At all times pertinent hereto, Plaintiff has been a qualified individual with a disability.

96. Defendant Mercy Housing failed to reasonably accommodate Plaintiff's disability.

97. Defendant violated § 102(a), 102(b)(1) and 102(b)(5) of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(a), 12112(b)(1) and 12112(b)(5).

98. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic injury in the form of lost backpay and benefits.

99. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer injuries in the form of future pecuniary loss, emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life. Plaintiff claims damages for these injuries pursuant to 42 U.S.C. § 1981a.

## SECOND CLAIM FOR RELIEF
### (ADA – Wrongful Termination)

100. Plaintiff incorporates by reference the allegations set forth above in paragraphs one through 99.

101. At all times pertinent hereto, Plaintiff has been a qualified individual with a disability.

102. Defendant intentionally discriminated against Plaintiff by terminating her employment because of her disability.

103. Defendant violated § 102(a) of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(a).

104. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic injury in the form of lost backpay and benefits.

105. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer injuries in the form of future pecuniary loss, emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life. Plaintiff claims damages for these injuries pursuant to 42 U.S.C. § 1981a.

### THIRD CLAIM FOR RELIEF
### (ADA – Coercion and Retaliation)

106. Plaintiff incorporates by reference the allegations set forth above in paragraphs one through 105.

107. Plaintiff exercised the rights she had to seek reasonable accommodation under Title I of the Americans with Disabilities Act of 1990.

108. Plaintiff acted in opposition to Defendant's discriminatory practice of failing to accommodate her disability.

109. Defendant coerced or interfered with Plaintiff in her exercise of her right to seek reasonable accommodation.

110. Defendant retaliated against Plaintiff because of her opposition to Defendant's failure to reasonably accommodate her disability.

111. Defendant violated § 503(a) and (b) of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12203(a) and (b).

112. As a direct and proximate result of Defendant's unlawful coercion, interference and retaliation, Plaintiff has suffered and continues to suffer economic injury in the form of lost backpay and benefits.

113. As a direct and proximate result of Defendant's unlawful coercion and retaliation, Plaintiff has suffered and continues to suffer injuries in the form of future pecuniary loss, emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life. Plaintiff claims damages for these injuries pursuant to 42 U.S.C. § 1981a.

### FOURTH CLAIM FOR RELIEF
(Rehabilitation Act of 1973)

114. Plaintiff incorporates by reference the allegations set forth above in paragraphs one through 113.

115. Defendant is a "program or activity receiving Federal financial assistance" and is subject to §§ 504 and 505 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 and 794a.

116. At all times pertinent hereto, Plaintiff has been "disabled" as defined in the Rehabilitation Act of 1973.

117. At all times pertinent hereto, Plaintiff has been "otherwise qualified" for her position with Defendant.

118. Defendant failed to reasonably accommodate Plaintiff's disability and terminated her employment because of her disability.

119. Defendant intentionally discriminated against Plaintiff on the basis of her disability.

120. Defendant violated the Rehabilitation Act of 1973.

121. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic injury in the form of lost backpay and benefits.

13

122.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer injuries in the form of emotional pain and suffering, mental anguish and loss of enjoyment of life. Plaintiff claims damages for these injuries pursuant to 29 U.S.C. § 794a.

**WHEREFORE**, Plaintiff Sharon Kramer respectfully requests this Court to enter judgment in her favor and against Defendant Mercy Housing, Inc., and to award her damages for lost backpay, front pay and benefits; personal humiliation, severe emotional distress, inconvenience, mental anguish, future pecuniary loss and loss of enjoyment of life; costs, interest and expert fees; attorney fees; injunctive relief; and such other and further relief as this Court deems proper.

**PLAINTIFF DEMANDS TRIAL OF THIS CAUSE BY JURY**

Respectfully submitted,

*s/ Hugh S. Pixler*
Hugh S. Pixler, #17006
Law Office of Hugh S. Pixler, LLC
1942 Broadway, Suite 314
Boulder, CO 80302
Telephone:  (303) 413-3464
Fax:     (303) 938-6850
E-mail: Hugh@Pixlerlaw.com
Attorney for Plaintiff

Plaintiff's Address:

4757 South Quintero Street
Aurora, CO 80015